UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LEONARDO MONDRAGON HERNANDEZ,

Petitioner,

v.

MARTIN GAMBOA, Warden,

Respondent.

No.  1:25-cv-00018-JLT-SKO (HC)

**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**

**[21-DAY OBJECTION DEADLINE]**

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  As discussed below, the Court finds the petition to be without merit and recommends it be **DENIED.**

**I.       PROCEDURAL HISTORY**

On April 27, 2022, a Merced County jury found Petitioner guilty of 7 felonies involving sex crimes against multiple children including: two counts of oral copulation/sexual penetration of a child 10 years or younger (Cal. Penal Code § 288.7(b)); one count of aggravated sexual assault, oral copulation, of a minor by force (Cal. Penal Code § 269(a)(4)); one count of aggravated sexual assault using a foreign object (Cal. Penal Code § 269(a)(5)); one count of forcible lewd act upon a child (Cal. Penal Code § 288(b)(1)); and two counts of lewd or

lascivious acts on a child under 14 years of age (Cal. Penal Code § 288(a)). (Doc. 16-1 at 269-72.[1]) On June 17, 2022, Petitioner was sentenced to an indeterminate term of 75 years to life plus 2 years. (Doc. 16-1 at 269-72.)

On March 22, 2024, the California Court of Appeal affirmed the judgment. (Doc. 34-46.) People v. Hernandez, No. F084535, 2024 WL 1223857, at *1 (Cal. Ct. App. Mar. 22, 2024). Petitioner petitioned for rehearing, and rehearing was denied on April 11, 2024. (Doc. 16-12.)

Petitioner then petitioned for review in the California Supreme Court. (Doc. 16-13.)  On May 29, 2024, the California Supreme Court summarily denied review. (Doc. 16-13.)

On January 6, 2025, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.)  Respondent filed an answer on June 18, 2025. (Doc. 17.)  Petitioner did not file a traverse.

## II.    FACTUAL BACKGROUND[2]

### A. Prosecution Case

#### 1. Sexual Abuse Against V.A. (counts 1 through 5):

##### a. V.A.'s testimony

V.A. testified that Petitioner had married her maternal aunt, Azucena. V.A.'s mother, E.J., was a single, working parent who "always" left V.A. with Petitioner and her aunt. As a result, Petitioner often watched V.A.  Petitioner had two daughters, G.H. and C.H., with whom V.A. was close. Their families were very close and had frequent get-togethers.

Petitioner began his sexual abuse of V.A. when V.A. was three or four years old. The first incident of abuse occurred at Petitioner's house in Merced while Petitioner babysat V.A. and C.H. while Azucena was on an errand. Petitioner suggested playing hide-and-seek. He told C.H. to hide and then grabbed V.A.'s hands, pulled down her pants, and touched and rubbed his fingers inside her vagina. V.A. stood there in shock; she did not know what to do because he was stronger than she was. She did not scream because she was in shock.

---

[1] Citations are to ECF pagination unless otherwise noted.
[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts in People v. Hernandez, 2024 WL 1223857, at *1-6.  See Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

The next incident of abuse happened during a family birthday party at Petitioner's house when V.A. was five or six years old. On V.A.'s way to use the restroom, Petitioner exited his room, grabbed V.A. and pulled her into his room and locked the door. Petitioner threw V.A. on the bed, pinned down her arms and legs, kissed her, touched her vagina with his hand, and put his mouth on her vagina. V.A. was in shock but yelled at Petitioner that she had to pee really bad, and he let her go.

Incidents of Petitioner putting his fingers inside her vagina and putting his mouth on her vagina continued until V.A. was 13 years old. When V.A. was age seven to nine, Petitioner put his mouth on her vagina and his fingers inside her vagina multiple times.

After V.A. was nine years old, another incident occurred at Petitioner's home. V.A. messaged C.H. asking if she was home alone. When C.H. replied yes, V.A. walked into Petitioner's home, expecting C.H. to be there alone, but Petitioner was on the living room floor lying on a blanket. V.A. tried to run to C.H.'s room, but Petitioner jumped up, and used the blanket to forcibly grab V.A. by wrapping his blanket around her, and then forcefully tried to kiss her. V.A. tried to bite him on the lip, but she could not get away. Petitioner let V.A. go when C.H. came out of her room. V.A. ran with C.H. into C.H.'s room and locked the door.

Overall, Petitioner's sexual assaults of V.A. occurred from the time she was three or four years old to 13 years old. During the incidents, Petitioner would tell her that she was "so beautiful," "prettier" and "better than his daughters," that she "would do everything right," and that he "wanted his daughters to be just like [her]." He always told V.A. that "everything was okay" and that he "was taking care of [her]." C.H. never knew what happened between Petitioner and V.A., although there were two times where she interrupted them and may have seen what happened. V.A. never talked to C.H. about it because it was her father. From 10 years old to 13 years old, V.A. started defending herself from Petitioner, but he was still able to force these acts on her.

When V.A. was younger, she did not tell anyone about Petitioner's sexual abuse because she feared that she would not be believed. When V.A. was older, she told her fiancé Javier about the abuse because V.A. was having nightmares of Petitioner and difficulty having sex. V.A. then

told her mother, E.J. One week before V.A. filed a police report about Petitioner's abuse, V.A. told C.H. that she needed to talk with Petitioner and C.H.'s family while her family was present because she could not "take it no more." C.H. relayed this to Petitioner who said he was ready to talk.

The purpose of the family meeting was to discuss Petitioner's had sexual abuse of V.A. The meeting was attended by V.A., Petitioner, Azucena, C.H. and G.H., E.J. and V.A.'s fiancé, Javier. V.A. wanted everyone to know about Petitioner's sexual abuse so that they would not think she was lying when she later filed a police report. V.A. confronted Petitioner with his actions. She brought up specific examples of Petitioner's sexual abuse, such as touching her while he told C.H. to play hide-and-seek and the blanket situation. After each scenario V.A. mentioned, Petitioner responded, "Yes, I remember, and I'm sorry." Petitioner said something like, "'If I've done anything to offend you, I apologize,'" he was sorry for everything he did and went on his knees and begged for forgiveness, but he did not shed a tear. V.A. forgave Petitioner but told him she would never forget what he did and that she would fight for him to be jailed. V.A. then went alone to file a police report.

V.A. testified that from age six or seven years old until 12 years old, she was a paid employee in Petitioner's fruit business. According to V.A., at the family meeting, there was never any discussion of using V.A.'s name for Petitioner's liquor license. V.A. denied that she suggested the store be put in her name and in Javier's name.

**b. E.J.'s testimony**

E.J. said that her daughter V.A. told her things Petitioner did to her when she was a child. As a result, there was a family meeting at Azucena's house in Merced to discuss what happened. At the meeting, V.A. confronted Petitioner about sexually abusing her. E.J. testified that Petitioner said he "had already foreseen this" and that he "was actually going to ask [V.A.] for forgiveness." V.A. gave him specific examples of what he had done to her as a child and he apologized. E.J. testified that at the family meeting, Petitioner and V.A. never discussed going into business together or using a liquor license.

**c. Javier's testimony**

Javier was V.A.'s ex-boyfriend. He testified that V.A. had told him she was sexually abused by Petitioner. Javier was present at the family meeting when V.A. confronted Petitioner about sexually abusing her. Petitioner admitted everything by going on his knees and admitting to everything that came out of V.A.'s mouth and apologizing. V.A. was confronting him about sexually abusing her as a child. Petitioner did not provide any details of his own but acquiesced to V.A.'s statements.

Javier testified that there was no discussion at the family meeting about putting the store under Javier's and V.A.'s names.

**d. C.H.'s testimony**

C.H., Petitioner's older daughter, testified that she never witnessed anything sexually happening between Petitioner and V.A. V.A. never talked to C.H. about Petitioner touching V.A. when C.H. was a child.

Once in 2018 or 2019 at the store while E.J. was present, V.A. told C.H. and Azucena that Petitioner had sexually abused her. C.H. said that was the only time V.A. had told her about her father sexually abusing her. C.H. told V.A. that she would support her if she decided to report Petitioner to the police because C.H. thought V.A.'s allegation was true and C.H. was mad at Petitioner because she felt that he had abandoned her, Azucena, and G.H.

C.H. agreed that the family meeting was held for the purpose of V.A. confronting Petitioner about sexually abusing her. According to C.H., her younger sister G.H. was told to go into another room during the family meeting, but V.A. said it would be better if everyone was there. At the meeting, V.A. confronted Petitioner, but V.A. did not say the specific words that she was sexually assaulted by Petitioner or confronted him with specific incidents of touching her as a child. She agreed that Petitioner got on his knees and apologized to V.A., who also got on her knees. Petitioner made "a general apology," saying that he was sorry if he ever offended anyone. C.H. claimed that she did not hear anything in the conversation about something sexual happening. C.H. said that Petitioner and V.A. "made up" and everybody hugged.

C.H. claimed that after V.A. confronted Petitioner about his sexual abuse at the family

1    meeting, V.A., Javier, and Petitioner discussed a business deal in everyone's presence. C.H. said

2    that V.A. was excited about having Petitioner's business in her name. C.H.'s parents could not

3    have the business in their names because they were not citizens and C.H. could not have it in her

4    name because she was not 21 years old. But since V.A. would soon be 21 years old and Javier

5    was 21 years old, they discussed having the business and its liquor license in V.A.'s and Javier's

6    names. V.A. "was excited about having the business in her name." V.A. and Javier said, "'Yeah.

7    Yeah. We'll do it.'"

8         In November 2019, Merced Police Department Officer Joseph Opinski and Detective

9    Cruz Jasso interviewed C.H. while she was at work at a fruit stand. C.H. stated that when she was

10   about six, she saw Petitioner on top of seven-or eight-year-old V.A. trying to kiss her, which C.H.

11   tried to forget as a child. C.H. also stated that when V.A. slept over, Petitioner would stand in the

12   doorway in his boxers, which she described as "'creepy'"; she did not tell the officers that these

13   events were based on a conversation with V.A. C.H. reported in her interview that she was

14   present at the family meeting and that Petitioner apologized to V.A. for molesting her as a child.

15        At trial, C.H. viewed portions of her interview transcript and claimed that she did not

16   recall saying what was in it. C.H. claimed that she did not observe anything between Petitioner

17   and V.A. when she was younger. C.H. testified that although she had reported that she walked in

18   on Petitioner on top of V.A. trying to kiss her, that was something V.A. had told C.H., but C.H.

19   did not recall actually observing that. C.H. admitted that she did not tell Opinski that was because

20   of something V.A. told her, but said that it was what she observed and walked in on. C.H.

21   acknowledged stating that when V.A. would sleep over, her father would stand in the doorway in

22   his boxers, which C.H. described as "'creepy,'" but she maintained that description was based

23   upon what V.A. had told her. C.H. claimed that she was busy at work when interviewed and that

24   she did not know to say that the reason she said her father was "creepy" was based on her

25   conversation with V.A. C.H. testified that she did not recall the incident now since it was a long

26   time ago. Additionally, C.H. did not remember telling Officer Opinski that her father apologized

27   to V.A. for molesting her as a little girl. Later, in November 2021, C.H. told a defense

28   investigator that at the family meeting, Petitioner made "a general apology" to everyone if he had

offended them.

C.H. admitted it was hard for her to see her father in court and to testify as a witness. C.H. loved her father and admitted she did not want anything to happen to him.

### 2. Sexual Abuse Against M.H. (count 6) and E.D. (count 7):

#### a. M.H.'s testimony

M.H. and E.D. are sisters. M.H. knew Petitioner because she was friend of his daughter, C.H. M.H. was about the same age as C.H., and E.D. was younger than M.H. Their families were close and they got together almost daily, went to church together, and the mothers worked together.

M.H. testified that around August 2004 when she was eight years old, she visited Petitioner's home in Merced County for a sleepover with C.H. They slept together in a large bed with Petitioner positioned furthest to the left, then C.H., then Azucena, and then M.H. Azucena woke up and left for work. Petitioner scooted C.H. over and laid next to M.H. Petitioner put his arm around M.H. and M.H. told him her dad would not like that and asked him to move his arm please. Petitioner then licked M.H.'s right ear and neck and had his fingers on her vagina. Petitioner told M.H. she was the prettiest one and asked her to be his girlfriend. While Petitioner was engaging in that behavior, M.H. was crying and asked if she could call her father. Petitioner said she could not and that it was okay, it was almost daytime. M.H. then asked to go to the restroom. When M.H. went to the restroom she got on her knees and prayed to God to make him stop doing what he was doing. M.H. returned to the bed with Petitioner, and while she was lying on her back, Petitioner put his leg over her, and she felt what she now knows was a hard penis against her. Petitioner put his hand in her underwear and put his fingers in her vagina.

M.H. was scared and did not make a noise; she did not try to awaken C.H., who was sleeping. M.H. heard a worker named Marcos outside the bedroom window, but she did not ask him for help because she was scared. M.H. did not try to leave the home because she was scared.

M.H. eventually fell asleep and when she awoke, Petitioner and C.H. were not in the bedroom. In the morning, M.H. called her father between 11 and 15 times to pick her up, but he did not answer. M.H. left numerous voicemails for her father to pick her up. When he eventually

7

picked her up, she did not tell him what had happened.

A couple of days later, M.H. told her younger sister, E.D., that Petitioner sexually assaulted her. Their aunt overheard their conversation and told their mother about it; then their mother told their father about it. A report was made to law enforcement.

**b. E.D.'s testimony**

E.D. testified that when she was home in Merced and her parents were outside, Petitioner grabbed E.D. by the buttocks, lifted her up in the air, sat her on his lap, talked in her ear, and told her that she was beautiful, prettier than her sister, and his favorite. A couple of times when she was on Petitioner's lap, he put his hand under her shirt, rubbed her back, put his fingers inside the lining of her skirt, and pulled back her skirt. Sometimes she tried to get up to walk away, but he yanked her back by her skirt and sat her back on his lap.

At Petitioner's home, Petitioner sat E.D. on his lap and talked to her the same way he did at her house, but he did not touch her inappropriately there. At the time, she did not tell her parents what was occurring. Nor did E.D. tell her teachers or the school nurse. After a discussion with her sister, M.H., E.D. told her parents. M.H. and E.D.'s father made a report with law enforcement and brought them to the sheriff's office to be interviewed.

**c. M.H.'s and E.D.'s statements to investigators**

Officer Aaron Rosenberg of the Merced County Sheriff's Office spoke with M.H. and E.D.'s father, J.H., about a sexual abuse report involving Petitioner. The officer interviewed nine-year-old M.H., who disclosed the incident in Petitioner's bedroom, where Petitioner had kissed and licked M.H.'s ear and asked if she wanted to be his girlfriend. M.H. reported that after she went to the bathroom and came back to the bedroom, Petitioner laid down next to her, put his leg over her, rocked back and forth, and put his hand under her pants, but on top of her underwear without skin-to-skin contact with her vagina.

Officer Rosenberg interviewed seven-year-old E.D. twice. In the first interview, E.D. said that Petitioner's abuse occurred about 20 times. In the second interview, E.D. said it was 50 times in one month and 40 times in another month. E.D. reported that Petitioner would grab her, put her on his lap, place his hand palm-up between his thigh and her buttocks over her clothes, rub her

8

1    back, and tell her that she was the prettiest girl in the family. E.D. reported that Petitioner never

2    touched her vagina or made skin-to-skin contact with her buttocks.

3        **B. Defense Case**

4        Petitioner testified that he and Azucena divorced, and they were already separated around

5    the time of the family meeting. In August 2019, he was convicted of misdemeanor domestic

6    violence against Azucena.

7        Petitioner agreed that V.A. was left to be cared for at his home over the years, while C.H.

8    was a child. Petitioner admitted he told V.A. that she was pretty, like an uncle who loved his

9    niece, but never said she was prettier than his daughters. Petitioner said any physical contact with

10   V.A. was limited to a hug. Petitioner denied each of V.A.'s allegations that he sexually assaulted

11   her, claiming that her allegations were lies. Petitioner maintained that V.A. never confronted him

12   with sexually abusing her as a child.

13       Petitioner maintained that C.H.'s recorded statement to officers—in which C.H. stated that

14   she saw Petitioner on top of V.A. as a child, that she saw him try to kiss V.A., and that he

15   apologized at the family meeting for molesting V.A. as a child—was influenced by V.A.

16   Petitioner stated that the purpose of the family meeting was to apologize for the differences he

17   and V.A. had before.

18       Petitioner had a fruit stand that was in C.H.'s name but run and owned by Azucena. V.A.

19   began helping at the fruit stand at age 10 or 11, became a paid employee at age 15, and worked

20   there until age 19.

21       When V.A. was 15 years old, she gave Petitioner's wife and daughters some marijuana

22   edibles. Petitioner confronted V.A. about her doing so and threatened that he would report her to

23   the police if she did that again. Petitioner was close friends with V.A.'s father, who was deported

24   because of involvement with drugs. V.A. complained to Petitioner asking for an explanation

25   because she thought her father's deportation was Petitioner's fault.

26       A family meeting occurred in which Petitioner and V.A. discussed their past conflicts and

27   disagreements, including the edibles incident and V.A.'s father's deportation. They both cried and

28   apologized to each other while Petitioner was on his knees. When Petitioner apologized, in his

1  mind he was asking V.A. for forgiveness for having been a little too upset when he confronted her

2  about the edibles and regarding her father. After they apologized, they embraced and ended the

3  meeting on good terms.

4      After the meeting, V.A. and Javier suggested that Petitioner put the business in their

5  names. Petitioner explained that he had a store, which he could not legally put under his name or

6  his wife's name, so he put it in the name of one of his nieces, but she could no longer have it in

7  her name because she was receiving Medi-Cal. C.H. was not old enough to have it in her name

8  because she was still a minor. Petitioner told V.A. and Javier to give him a few days to think it

9  over. Th following week Petitioner learned that V.A. had reported he had sexually assaulted her.

10     Petitioner stated that V.A. never accused him of sexually molesting her at the meeting and

11  he never confessed to having molested her. When Petitioner was asked if he knew why V.A. had

12  purportedly lied about him sexually assaulting her, he claimed that she must not have left behind

13  her hard feelings about the edibles and about her father at the meeting.

14     Petitioner testified that M.H. came over once to play with C.H. and slept overnight at their

15  home. They all slept in the same bed with Petitioner sleeping next to Azucena, then C.H., and

16  then M.H. Petitioner did not recall having physical contact with M.H. and denied her allegations

17  of sexual assault, which he claimed were lies. Petitioner also denied telling her she was pretty and

18  denied that he did not allow her to call her father.

19     Petitioner also denied E.D.'s allegations of sexual assault, which he claimed were lies.

20  When Petitioner was asked if he knew why M.H. and E.D. had purportedly lied about him

21  sexually assaulting them, he explained that he had lent their father, J.H., $10,000 and that J.H.

22  was upset when Petitioner asked for the money back from him, but he was not sure that was the

23  reason for their accusations. Petitioner said J.H. still had not repaid that money.

24  **III.    DISCUSSION**

25      A.    Jurisdiction

26     Relief by way of a petition for writ of habeas corpus extends to a person in custody

27  pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

28  treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

10

1   529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

2   guaranteed by the United States Constitution.  The challenged conviction arises out of the Merced

3   County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

4   2254(a); 28 U.S.C.§ 2241(d).

5          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

6   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

7   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

8   filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

9   and is therefore governed by its provisions.

10         B.      Legal Standard of Review

11         A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

12  the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

13  that was contrary to, or involved an unreasonable application of, clearly established Federal law,

14  as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

15  based on an unreasonable determination of the facts in light of the evidence presented in the State

16  court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

17  Williams, 529 U.S. at 412-413.

18         Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

19  federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

20  Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

21  [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

22  (2005) (citing Williams, 529 U.S. at 405-406).  This court looks to "Supreme Court holdings at

23  the time of the state court's last reasoned decision" as "the source of clearly established Federal

24  law for the purposes of AEDPA."  Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A

25  Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court

26  "squarely addresses the issue" in the case before the state court.  Wright v. Van Patten, 552 U.S.

27  120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied

28  federal law to a claim of prejudice under Strickland where the logic of petitioner's argument

11

1   would have required the extension of the Supreme Court's inherent prejudice doctrine to a new

2   context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are

3   fundamental enough that when new factual permutations arise, the necessity to apply the earlier

4   rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state

5   court may draw a principled distinction between the case before it and Supreme Court caselaw,

6   the law is not clearly established for the state-court case." Murdoch v. Castro, 609 F.3d 983, 991

7   (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at

8   hand,' then by definition the rationale was not 'clearly established at the time of the state court

9   decision.'" White v. Woodall, 572 U.S. 415, 426 (2014) (quoting Yarborough, 541 U.S. at 666).

10      In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

11  an "unreasonable application" of federal law is an objective test that turns on "whether it is

12  possible that fairminded jurists could disagree" that the state court decision meets the standards

13  set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

14  application of federal law is different from an incorrect application of federal law.'" Cullen v.

15  Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state

16  court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, 592 U.S. 111, 118

17  (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (*per curiam*)).  Rather, a state

18  prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's

19  ruling on the claim being presented in federal court was so lacking in justification that there was

20  an error well understood and comprehended in existing law *beyond any possibility of fairminded*

21  *disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118.  In

22  other words, so long as fairminded jurists could disagree with each other as to whether the state

23  court was correct, the state court decision is not unreasonable under AEDPA.  Congress "meant"

24  this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

25      Section 2254(d)(2) pertains to state court decisions based on factual findings.  Davis v.

26  Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

27  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

28  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

12

1    facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

2    U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  The federal habeas

3    court must give "substantial deference" to the state court. Brumfield v. Cain, 576 U.S. 305, 314

4    (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the

5    burden of overcoming the presumption with "clear and convincing evidence to the contrary."

6    Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable

7    when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries,

8    114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*,

9    Maddox v. Taylor, 543 U.S. 1038 (2004).  If "'[r]easonable minds reviewing the record might

10   disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's

11   factual determination was unreasonable. Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in

12   original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).

13          To determine whether habeas relief is available under § 2254(d), the federal court looks to

14   the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

15   Nunnemaker, 501 U.S. 979, 803 (1991); Andrews v. Davis, 994 F.3d 1042, 1107 (9th Cir. 2019)

16   (en banc).  "[A]lthough we independently review the record, we still defer to the state court's

17   ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

18          The prejudicial impact of any constitutional error is assessed by asking whether the error

19   had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

20   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

21   (holding that the Brecht standard applies whether or not the state court recognized the error and

22   reviewed it for harmlessness).

23          C.      Review of Petition

24          Petitioner presents the following two[3] grounds for relief: 1) Petitioner claims he was

25   denied his right to a complete defense in violation of Crawford v. Washington, 541 U.S. 36

26   (2004); and 2) Petitioner alleges he was denied the effective assistance of counsel due to trial

27

28   _____
     [3] Grounds Three and Four were stricken as unexhausted on May 23, 2025. (Doc. 15.)

counsel's failure to investigate all defenses.

### 1. Claim One

In his first ground for relief, Petitioner alleges the trial court violated his constitutional right to present a complete defense when it excluded G.H. from testifying as a defense witness. Petitioner raised this claim on direct appeal to the Fifth District Court of Appeals.  In the last reasoned decision, the appellate court denied the claim as follows:

**I. The Trial Court Did Not Abuse Its Discretion in Excluding G.H.'s Testimony.**

Appellant claims that the trial court erred when it excluded G.H. from testifying as a defense witness, which he claims prejudicially violated his constitutional right to present a defense. Appellant also claims the trial court erred by failing to consider and exhaust all lesser sanctions before precluding G.H. from testifying. Alternatively, appellant claims that the matter should be remanded for an evidentiary hearing pursuant to section 1260. The People contend the court properly exercised its discretion in excluding G.H.'s testimony and that even if it erred, appellant has not established prejudice. The People also contend that appellant fails to demonstrate any basis to set aside the jury's verdict and findings in order to remand for an evidentiary hearing. We conclude appellant's claim fails.

**A. Relevant Background**

On October 25, 2021, the People made an informal, continuing request for disclosure and discovery of "[t]he names and addresses of persons, other than the defendant(s), whom counsel or defendant(s) intends to call as witnesses at trial" pursuant to sections 1054.3, subdivision (a), and 1054.7. On April 15, 2022, appellant was present at a hearing on the in limine motions. There, the trial court granted the People's motion, which was made pursuant to Evidence Code section 777, "[t]hat all actual or potential witnesses be excluded from the courtroom during the trial proceedings." At the hearing, the court was provided with a proposed witness list. On April 19, 2022, during voir dire, the court read the witness list to the prospective jurors, which did not include G.H. as a witness.

During trial, after the prosecution rested, appellant elected to testify on his own behalf. Defense counsel then informed the court of the following:

"THE COURT: Okay. And you wanted to put something else on the record?

"[DEFENSE COUNSEL]: Yes. It's an ancillary issue. It may become important later.

"At [appellant's] request or urging, my investigator attempted to make contact with Suzy or Azucena and [G.H.], and this was—this was around Easter—and did make contact with them, and they expressed an interest in talking to him on Saturday, asked him to wait past Easter Sunday, and they would talk to him on Monday. I'm getting this from my investigator. I've had no contact with these people.

"According to my investigator, when he contacted them on Monday, they were of a different state of mind and refused to and refused to speak with him, and they're not obligated to, so that line of investigation was closed, and [G.H.] is still a minor anyway, so I'm not sure we could have spoken to her without—without an investigator present—I should say without an adult present, a parent or guardian.

"Apparently [G.H.] came to court on her own without my knowing it and has been sitting in the audience today, and I didn't know about it until we just took our break. [Appellant] wants me to call her as a witness. I think I'm impacted by the fact that she sat—that she sat in the audience as a spectator. Also, we haven't interviewed her yet; although, I suspect it would likely be favorable to [appellant]. I don't know—actually know what she would say, but apparently she's also been sitting in the audience as a spectator, which I didn't know about until now.

"So I feel devastated as counsel by that, but I think our office handled things properly and did what we could. If [G.H.] is here as a compromised witness because she didn't—because she didn't talk to us before she chose to appear as a spectator, I guess we have to live with that.

"[C.H.] did offer all of the testimony favorable to the defense that I would expect any other family member to offer, so there's that, and that's kind of where the—the defense case is now.

"[Appellant] is still available to testify and will testify; and, unfortunately, I don't think I'm in a position to call [G.H.] even though she may still be in the courthouse."

The prosecutor opposed the defense calling G.H. as a witness, noting she was never on the witness list. The prosecutor noted that G.H. "was present during all of the testimony of her sister and heard the testimony of [Officer] Opinski." The prosecutor thought it would be improper to have G.H. testify "given the nature of what she's sat in on, what she's aware of, and [since] there's no permission from her mother."

The court responded, "No, at this point I would not allow her to testify since she did sit in and listen to all of the testimony, and especially if she's a minor, that would cause the Court concern as well, and it is very late [notice]."

Defense counsel explained, "No, I understand, and [G.H.] wasn't on the witness list because we never interviewed her, so I had no reason to think she was a witness until possibly this morning."

After the lunch break, defense counsel informed the court that when he got back to his office for the lunch break, his investigator told him that Azucena called and said, "'I still don't want to get involved. I don't want to give you a statement. I don't want to testify but my daughters do.'" The defense counsel had his investigator tell Azucena that G.H. could not testify because she sat through the proceedings, was underage and in the courtroom without her mother, but that C.H. did testify.

**B. Standard of Review**

"In determining the admissibility of evidence, the trial court has broad discretion."

15

(*People v. Williams* (1997) 16 Cal.4th 153, 196; *People v. Peoples* (2016) 62 Cal.4th 718, 757.) "A trial court's ruling to admit or exclude evidence ... is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705, 708 [admitting evidence as a spontaneous declaration]; *People v. Smith* (2003) 30 Cal.4th 581, 627 [expert testimony]; *People v. Pearson* (2013) 56 Cal.4th 393, 443 [expert testimony]; *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.)

The exclusion of witnesses from the courtroom is a matter within the trial court's discretion. (*People v. Garbutt* (1925) 197 Cal. 200, 205; *People v. Valdez* (1986) 177 Cal.App.3d 680, 687; *People v. Boyden* (1953) 116 Cal.App.2d 278, 283; *People v. Persky* (1959) 167 Cal.App.2d 134, 139; *People v. Willingham* (1969) 271 Cal.App.2d 562, 571; Witkin, Cal. Evidence (2d ed. 1966) § 1100, p. 1018.) Likewise, a court's exercise of its discretion in sanctioning a violation of discovery is reviewed under the abuse of discretion standard. (*People v. Ayala* (2000) 23 Cal.4th 225, 299; *People v. Lamb* (2006) 136 Cal.App.4th 575, 581.)

We apply a deferential standard of review upholding the trial court's ruling unless it "'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).) "An abuse of discretion also occurs if the court applies an erroneous legal standard or its factual findings are not supported by substantial evidence." (*Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 110.)

## C. Relevant Law

"Whether rooted directly in the Due Process 'Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) The California Constitution, article I, section 15, similarly guarantees a defendant the right "to compel attendance of witnesses in the defendant's behalf." (See also *People v. Capers* (2019) 7 Cal.5th 989, 1008 [right to a compulsory process for obtaining witnesses in his favor].) It likewise guarantees that a defendant will "not 'be deprived of life, liberty or property without due process of law.'" (*People v. Ramos* (1984) 37 Cal.3d 136, 153, quoting Cal. Const., art. I, § 15.)

But a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." (*Taylor v. Illinois* (1988) 484 U.S. 400, 410; accord, *Montana v. Egelhoff* (1996) 518 U.S. 37, 42; see *People v. Mincey* (1992) 2 Cal.4th 408, 439–440 [application of ordinary rules of evidence does not deprive the defendant of constitutional right to present defense].) The constitutional right to a meaningful opportunity to present a complete defense is limited by """state ... rulemakers['] ... broad latitude ... to establish rules excluding evidence from criminal trials."'" (*Nevada v. Jackson* (2013) 569 U.S. 505, 509.) "Only rarely [has the United States Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." (*Ibid.*)

Section 1054.3, subdivision (a)(1) provides, in part, that a defendant and defense

16

counsel shall disclose to the prosecutor "[t]he names and addresses of persons ... he ... intends to call as witnesses at trial."

Section 1054.5, subdivision (b) provides that "a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." "The court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted." (§ 1054.5, subd. (c); see *People v. Hammond* (1994) 22 Cal.App.4th 1611, 1624; *People v. Edwards* (1993) 17 Cal.App.4th 1248, 1252–1253.)

Courts have recognized various sanctions for untimely disclosure, including providing the witness's statement to the other party with an opportunity to interview the witness before they testify and additional time if required and requested (*People v. Walton* (1996) 42 Cal.App.4th 1004, 1017, disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3), posttrial monetary sanctions on defense counsel (*People v. Landers* (2019) 31 Cal.App.5th 288, 295, 306–307), and instructions to the jury on the defendant's delayed disclosure (CALCRIM No. 306 Untimely Disclosure of Evidence; *People v. Thomas* (2011) 51 Cal.4th 449, 480–483; *People v. Riggs* (2008) 44 Cal.4th 248, 306–307).

Evidence Code section 777, subdivision (a) provides in pertinent part that "the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses." The purpose of the order is to prevent tailored testimony and aid in the detection of less than candid testimony. (*Geders v. United States* (1976) 425 U.S. 80, 87; *People v Valdez, supra*, 177 Cal.App.3d at p. 687.) Where a witness is offered who violated the court's exclusion order, without fault of the defendant, "the Court might have punished them as for a contempt ... [but] constituted no ground for the exclusion of their testimony." (*People v. Boscovitch* (1862) 20 Cal. 436; *People v. Duane* (1942) 21 Cal.2d 71, 80.)

### D. Analysis

Appellant contends that G.H.'s testimony was crucial to the defense in order to contradict V.A.'s testimony that appellant apologized for sexually abusing V.A. at a family meeting, claiming G.H. would have corroborated C.H.'s testimony that appellant only made a general apology to past hurts. First, appellant argues that article I, section 15 of the California Constitution and the Sixth Amendment guarantee his right to compel the attendance of witnesses on his behalf. He claims the trial court deprived him of that right by precluding G.H. from testifying, which deprived him of his right to present a complete defense, in violation of due process of law. Second, appellant contends the trial court's failure to consider and exhaust all lesser sanctions before precluding G.H.'s testimony was erroneous. Third, he claims that precluding G.H. from testifying violated his Sixth Amendment right to compulsory process and to present a complete defense. Fourth, appellant claims that such error prejudicially contributed to the verdict since the prosecution relied heavily on V.A.'s testimony of events at the family meeting, and these convictions were used to strengthen the prosecutor's weak case on counts 6 and 7. Alternatively, appellant requests the matter be remanded to the trial court to conduct an evidentiary hearing pursuant to section 1260 to hear G.H. testify, "test her evidence, and gauge her demeanor" in order to build a factual record,

17

conceding that appellant has not had the "full and fair opportunity to develop the facts supporting his claim." We conclude the trial court did not abuse its discretion in precluding G.H. from testifying. (See *People v. Ledesma, supra*, 39 Cal.4th at p. 705; *People v. Ayala, supra*, 23 Cal.4th at p. 299; *People v. Lamb, supra*, 136 Cal.App.4th at p. 581; *People v. Garbutt, supra*, 197 Cal. at p. 205.)

While a trial court may not ignore the defendant's right to offer testimony of a witness in his favor, "the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests." (*Taylor v. Illinois, supra*, 484 U.S. at p. 414.) "The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance." (*Id*. at pp. 414–415; *People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1756.) "A party who creates prejudice to the other side by surprise or newly listed witnesses should not have the advantage of the disadvantage to which he ... has placed an opponent." (*Gonzales*, at p. 1757.) Thus, the trial court may exclude the testimony of a newly listed witness where it finds a willful violation of the rules of discovery and resulting prejudice to the prosecution if the witness were allowed to testify, but only after carefully considering the consequence of exclusion to the truth-finding process. (*Id*. at pp. 1757–1758.)

Here, the record shows the trial court weighed and considered multiple factors addressing the reliability of the evidence and potential prejudice in reaching its decision to preclude G.H. from testifying. These factors include:

(a) That the defense attorney just learned about appellant wanting G.H. to testify;

(b) That G.H. had refused to be interviewed in the past and counsel did not know what she would say;

(c) The prosecution objected to the late notice of the witness;

(d) The concern regarding reliability of G.H.'s testimony in listening to trial testimony of her older sister and Officer Opinski;

(e) The lack of notice of the witness given to the prosecution as required under section 1054.3;

(f) The witness was only identified by appellant after the close of the prosecution's case;

(g) The witness was a minor; and

(h) Defense counsel informed the court that "C.H. ... offer[ed] all of the testimony favorable to the defense that [he] would expect any other family member to offer."

### 1. Exclusion order

Initially, G.H. violated the exclusion order by remaining in court. The court ordered all witnesses excluded from the courtroom, except the designated

investigating officer, pursuant to Evidence Code section 777. G.H. sat in the courtroom and listened to the testimony from her sister C.H. and Officer Opinski before appellant indicated he wanted G.H. to testify. Defense counsel explained that he had no contact with G.H. and was unaware that she was in the courtroom or that appellant wanted her to testify. The trial court noted that G.H. sat in and listened to all of that day's testimony, which caused the court concern, especially since she was a minor. After listening to the testimony from her older sister, C.H., G.H. could be more impressionable or influenced by her family to tailor her testimony.

**2. Discovery statute**

Appellant also failed to comply with the discovery statute by not providing notice of his desire to call G.H. as a witness until after the prosecution rested. Defense counsel explained that G.H. came to court on her own without him knowing it and that appellant wanted him to call G.H. as a witness. He acknowledged she may be a compromised witness. Defense counsel admitted he did not know what G.H. would testify to, did not think he was in a position to call G.H. as a witness, and assured the court that C.H. offered all of the testimony favorable to the defense that he would expect any other family member to offer. On this record, we conclude the trial court's reasoning was rational and not arbitrary, and thus it properly exercised its discretion in precluding G.H. from testifying. (See *Carmony, supra*, 33 Cal.4th at p. 377.)

Appellant relies on *People v. Edwards, supra*, 17 Cal.App.4th 1248 and *People v. Superior Court* (*Mitchell*) (2010) 184 Cal.App.4th 451 to argue that precluding a witness for violating the discovery statute under section 1054.5 is allowed only as a last resort, where it has been shown the violation was willful and deliberate. (See *Edwards*, at pp. 1264–1265; *Mitchell*, at pp. 453–454, 459.) However, appellant ignores that *Edwards* and *Mitchell's* reasoning is limited to cases where a violation of the discovery statute was the sole basis for precluding a witness. Here, as discussed, there were multiple factors the court considered as the reason for precluding the witness, including violating the discovery statute and the exclusion order, that counsel did not know what G.H. would say, and that he believed he had all the testimony he needed. Therefore, *Edwards* and *Mitchell* are not controlling here.

Additionally, in *People v. Gonzales, supra*, 22 Cal.App.4th 1744, this court reversed the trial court's decision prohibiting the witness from testifying for failing to comply with discovery requirements. (*Id*. at p. 1754.) The court concluded that "the exclusion of the testimony of [the defendant's] witness was a violation of the compulsory process clause" because the trial court made no finding that the failure to disclose was willful and there was "no determination of irremediable prejudice or significant prejudice." (*Id*. at p. 1759.) However, *Gonzales* addressed a situation where the witness was precluded from testifying on the sole basis the defendant failed to comply with the discovery statute. (*Id*. at p. 1744.) Because G.H. was precluded from testifying on multiple grounds, not just for failure to comply with the discovery statute, *Gonzales* is not controlling here.

Similarly, appellant's argument that the court failed to consider and exhaust all lesser sanctions for violating the discovery statute before precluding G.H.'s testimony does not recognize that the violation of the discovery statute was not the sole basis for precluding the testimony. The requirement that other sanctions be exhausted before precluding testimony applies when the party has only violated the discovery statute. (See § 1054.5, subd. (c).) As discussed, here, there were

19

multiple violations and factors the court had to consider in reaching its decision.

Consequently, the trial court did not abuse its discretion since its decision to preclude G.H. from testifying was supported by substantial evidence. (See *Carmony, supra*, 33 Cal.4th at p. 377; *Kerner v. Superior Court, supra*, 206 Cal.App.4th at p. 110.)

### 3. No prejudice occurred

Even if we were to assume the court abused its discretion, appellant cannot show the claimed error resulted in a miscarriage of justice. (See *People v. Ledesma, supra*, 39 Cal.4th at p. 705.) "[T]o be entitled to relief on appeal from an alleged abuse of discretion, it must clearly appear the resulting injury is sufficiently grave to manifest a miscarriage of justice." (*In re Richard E.* (1978) 21 Cal.3d 349, 354; *In re K.H.* (2022) 84 Cal.App.5th 566, 606; accord, *People v. Johnson* (2022) 12 Cal.5th 544, 605–606.) The miscarriage of justice requirement permits "reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error." (*In re Celine R.* (2003) 31 Cal.4th 45, 60, citing *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Hernandez* (2011) 51 Cal.4th 733, 746 [appellant's burden to establish "a reasonable probability that error affected the trial's result"]; accord, *In re Christopher L.* (2022) 12 Cal.5th 1063, 1073.)

Here, appellant fails to establish a reasonable probability that the result would have been more favorable to him if the trial court had not precluded G.H. from testifying. The record does not support appellant's claim that G.H.'s testimony was crucial to the case. Defense counsel explained that G.H. had refused to talk to his investigator, her mother previously refused to let her testify, and as a consequence, defense counsel stated he did not know what G.H. would say if she testified. Appellant's claim that G.H. would have given the same testimony as C.H. is mere speculation, which is not evidence we can consider. (See *People v. Waidla* (2000) 22 Cal.4th 690, 735 [speculation is not evidence].) There is no evidence that G.H. would have testified the same as C.H., or in support of appellant's version of the family meeting.

Moreover, if we were to consider the presumption that G.H. would have given the same testimony as C.H., it would have been cumulative at best. Appellant concedes that C.H.'s testimony already contradicted V.A.'s testimony and corroborated his version of events at the family meeting. At trial, defense counsel admitted he had all the evidence he needed. Therefore, it cannot be ascertained from the record that G.H.'s testimony was crucial to the defense.

We reject appellant's argument that G.H.'s testimony would have been more credible than C.H. due to C.H.'s impeachment by her interview with Officer Opinski. Again, there is no evidence regarding what G.H. would have said and no way to know whether she would have been more credible. C.H. explained that the statements she gave to Opinski about her father were not what she observed but were influenced by V.A. C.H. said she forgot to tell Opinski this came from V.A. because she was in the middle of working with customers when she gave those statements. Otherwise, appellant concedes C.H.'s statements had been consistent. Thus, there is no evidence that G.H. would have been a more credible witness than C.H. or that her testimony would have made a difference in the outcome of the case.

Additionally, the prosecution's case was extremely strong. Multiple victims

testified that appellant sexually abused them. Even appellant's daughter C.H. reported to officers that when she was young she saw appellant on top of seven-or eight-year-old V.A. trying to kiss her, which C.H. tried to forget as a child. C.H. also reported that appellant would stand in the doorway in his boxers when V.A. slept over, which she described as "'creepy.'"

For counts 1 through 5, each of the prosecution witnesses who attended the family meeting agreed that the purpose of the meeting was for V.A. to confront appellant with sexually abusing her. Even C.H. consistently agreed that the purpose of the meeting was for V.A. to confront appellant about sexually abusing her. The testimony was consistent between appellant, V.A., Javier and C.H. that appellant got down on his knees and apologized to V.A. E.J., Javier, and V.A. testified that appellant apologized to specific examples of sexual abuse given by V.A. C.H. also testified that appellant got on his knees and apologized but said appellant only gave general apologies. However, in her interview with police, C.H. said that at the family meeting, appellant apologized to V.A. for molesting her as a child. Clearly, the jury believed V.A.'s testimony that appellant sexually abused her.

Accordingly, appellant fails to establish a reasonable probability that the result would have been more favorable to him if the court had allowed G.H. to testify. (See *In re Celine R., supra,* 31 Cal.4th at p. 60; *People v. Hernandez, supra,* 51 Cal.4th at p. 746.) Thus, a miscarriage of justice did not occur and there was no prejudice.

### 4. Right to present a complete defense

For the same reasons, appellant was not denied an opportunity to present a complete defense. "[M]ore than the mere absence of testimony is necessary to establish a violation of the right." (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 867.) Appellant personally testified in his defense that V.A.'s allegations did not occur and were lies. Appellant's daughter C.H. testified regarding the family meeting, denying V.A.'s allegations and corroborating appellant's version of the family meeting that appellant only gave general apologies. The defense attorney did not know what G.H. would say and informed the court that C.H. offered all of the testimony favorable to the defense that he would expect any other family member to offer. As such, the record does not support appellant's allegation that he was denied a complete defense. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 367 ["A defendant claiming a violation of this right must establish both that he was deprived of the opportunity to present material and favorable evidence and that the deprivation was arbitrary and disproportionate to any legitimate purpose."].)

Hernandez, 2024 WL 1223857, at *6-12.

a. Legal Standard and Analysis

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a

complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v.

Trombetta, 467 U.S. 479, 485 (1984)). Nevertheless, the Supreme Court has also recognized that

"'state and federal rulemakers have broad latitude under the Constitution to establish rules

excluding evidence from criminal trials.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006)

1    (quoting <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998)).  Only rarely has the Supreme Court

2    "held that the right to present a complete defense was violated by the exclusion of defense

3    evidence under a state rule of evidence." <u>Nevada v. Jackson</u>, 569 U.S. 505, 509 (collecting cases).

4           As set forth above, the California appellate court recognized and applied the correct legal

5    principle.  When the state court denied the claim, "the Supreme Court ha[d] not decided any case

6    either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a

7    complete defense or 'establish[ing] a controlling legal standard' for evaluating such exclusions."

8    <u>Brown v. Horell</u>, 644 F.3d 969, 983 (9th Cir. 2011) (quoting <u>Moses v. Payne</u>, 555 F.3d 742, 758

9    (9th Cir. 2009)).  Indeed, the Supreme Court "has never held that the Confrontation Clause entitles

10   a criminal defendant to introduce extrinsic evidence for impeachment purposes." <u>Nevada v.</u>

11   <u>Jackson</u>, 569 U.S. at 512.  This is fatal to Petitioner's claim as he is thus unable to "show that the

12   state appellate court's ruling was either contrary to or an unreasonable application of clearly

13   established Supreme Court precedent." <u>Smith v. Small</u>, 697 Fed.App'x. 538, 539 (9th Cir. 2017);

14   <u>Horell</u>, 644 F.3d at 983 ("the Supreme Court has not decided any case either 'squarely

15   address[ing]' the discretionary exclusion of evidence and the right to present a complete defense

16   or 'establish[ing] a controlling legal standard' for evaluating such exclusions," and as such,

17   petitioner could not "show that the state appellate court's ruling was either contrary to or an

18   unreasonable application of clearly established Supreme Court precedent.").

19          Even if the exclusion of witness G.H.'s testimony could somehow be construed to violate

20   Petitioner's constitutional rights, habeas relief would not be warranted.  The state court identified

21   "good reason[s]" for excluding G.H.'s testimony. <u>Clark v. Arizona</u>, 548 U.S. 735, 770 (2006).

22   The trial court noted that G.H. had remained and listened to her sister's testimony despite the trial

23   court's order that all witnesses be excluded from the courtroom.  The state court recognized that

24   G.H., in listening to her older sister's testimony, could be more impressionable or influenced by

25   her family to tailor her own testimony. The state court also noted that defense counsel was

26   unaware that G.H. had sat through C.H.'s testimony and he was not in a position to call G.H. as a

27   witness as he did not know to what G.H. would testify. Nevertheless, defense counsel stated C.H.

28   offered all the testimony favorable to the defense he would expect G.H. to provide, and therefore,

1   G.H.'s testimony would have been cumulative.

2        The quantity and quality of evidence incriminating Petitioner was also overwhelming.

3   Multiple victims testified that Petitioner had abused them. Even witness C.H. had informed

4   officers that she witnessed Petitioner on top of 8-year old victim V.A. forcibly trying to kiss her.

5   C.H. further agreed that the purpose of the family meeting was for V.A. to confront Petitioner

6   about sexually abusing her. C.H. agreed with other witnesses that Petitioner had gotten on his

7   knees and apologized. Thus, even if G.H. had testified, and her testimony was consistent with

8   C.H., the outcome would have been the same. Habeas relief is therefore unwarranted because

9   Petitioner has not shown that the alleged error had "a substantial and injurious effect or influence

10  in determining the jury's verdict." Brecht, 507 U.S. at 623.

11       The Court finds that the state court's determination that excluding G.H. from testifying

12  was proper was not contrary to, or an unreasonable application of, Supreme Court precedent, nor

13  does he show that the state court decision resulted from an unreasonable determination of the

14  facts. Accordingly, it is recommended that Petitioner's claim in Ground One--that he was denied

15  the opportunity to present a complete defense--be denied.

16            2.   Claim Two

17       Petitioner next contends defense counsel rendered ineffective assistance by failing to

18  investigate the facts of his case so as to present a proper defense, by being ignorant of the law and

19  failing to properly research the law, and by apologizing to M.H. This claim was also raised on

20  appeal.  In the last reasoned decision, the Fifth DCA rejected the claim as follows:

21       **II. Ineffective Assistance of Counsel**

22       Appellant claims he received ineffective assistance of counsel on several grounds:
         that his defense counsel failed to investigate the facts of his case, was ignorant of
23       the law and failed to research the law, and for apologizing to M.H. for making her
         "relive it." The People argue appellant fails to identify the law defense counsel
24       allegedly failed to research and fails to show his counsel was deficient in his duty
         to investigate the case. The People also argue appellant failed to demonstrate his
25       counsel was deficient for apologizing to M.H. We agree with the People and reject
         appellant's claims.
26
              **A. Relevant Law**
27
         A defendant claiming ineffective assistance of counsel must satisfy the two-part
28       test of *Strickland v. Washington* requiring a showing of counsel's deficient

performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id*. at p. 688.)

In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland, supra*, 466 U.S. at p. 689; see *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, at p. 689; *People v. Dennis*, at p. 541.)

"Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

"'Criminal defense attorneys have a "'duty to investigate carefully all defenses of fact and of law that may be available to the defendant.'"'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 222; *People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground as stated in *People v. Delgado* (2017) 2 Cal.5th 544, 559; *People v. McDowell* (1968) 69 Cal.2d 737, 746.) "Counsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts." (*People v. Ledesma*, at p. 222.)

"[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make." (*People v. Cleveland* (2004) 32 Cal.4th 704, 746; *People v. Williams, supra*, 16 Cal.4th 153, 216–217.)

The prejudice prong requires a defendant to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.)

### B. Analysis

As discussed below, we conclude appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. (See *Strickland, supra*, 466 U.S. at p. 687.)

### 1. Duty to investigate.

We reject appellant's argument that his defense attorney failed to investigate carefully all defenses available to him, specifically G.H. as a potential witness. (See *People v. Pope, supra*, 23 Cal.3d at p. 425.) The defense attorney explained to the court that he tried to interview G.H., but she refused to speak with his investigator. Additionally, G.H. was a minor and her mother refused to let her speak with the investigator. Although appellant claims that defense counsel failed to investigate G.H when he learned appellant wanted to call her as a witness, there is nothing in the record indicating that G.H. was willing to be interviewed at that time either.

The cases cited by appellant address the failure to investigate witnesses during preliminary investigations of the case in preparation for trial, not after the close of evidence as a last-minute surprise and compromised witness. (See e.g., *People v.*

*Ledesma, supra*, 43 Cal.3d at p. 223 [adequate preliminary investigation would recognize the defendant's state of mind at the time of the killing]; *In re Hill* (2011) 198 Cal.App.4th 1008, 1025 [absent a reasonable investigation and trial preparation, Hill's trial counsel did not have an adequate basis on which to make reasonable tactical decisions]; *People v. Jones* (2010) 186 Cal.App.4th 216, 239 [counsel " 'had no knowledge of the possible existence of witnesses' "].) Thus, these cases are not applicable here.

To say that G.H.'s decision to testify came last minute is an understatement. It was not until after the prosecution rested, that appellant told his counsel he wanted G.H. to testify. At this point in the trial, counsel had little to no opportunity to prepare or interview G.H. before having to decide whether to call her as a witness. Regardless, the record does not support appellant's claim that his defense counsel did not know the law regarding his duty to investigate. Counsel explains on the record that he made an effort to interview G.H. but that she refused to speak with his investigator.

Even assuming that defense counsel acted unreasonably by failing to interview G.H. after the close of the prosecution's case, there is no evidence this decision prejudiced appellant. There is nothing in the record about what G.H. would have testified to. Appellant suggests it would have been favorable to him, but this is pure speculation and not evidence we can consider. (See *People v. Waidla, supra*, 22 Cal.4th at p. 735 [speculation is not evidence].) At best, it would be the same testimony given by C.H. regarding the family meeting. Even so, this evidence was already before the court, as defense counsel explained. G.H.'s testimony would at best be cumulative, but less reliable since she had already listened to her sister testify. As such, appellant cannot show he would have received a more favorable verdict had defense counsel investigated G.H. and sought to have her testify.

Even if we assume G.H. was willing to be interviewed by defense counsel at trial, there is nothing in the record demonstrating that her testimony would have been favorable or affected the outcome of the verdicts. Although defense counsel assumed G.H.'s testimony would be favorable, he conceded he did not know what G.H. would testify to. Even assuming that G.H.'s testimony would match C.H.'s testimony, then at best, it would have been cumulative, and not add anything other than what was already offered at trial. Defense counsel understood this when he explained to the court he already had all of the evidence he needed. Therefore, appellant cannot demonstrate he was prejudiced by his counsel's decision to not investigate G.H. as a potential witness at trial.

## 2. Duty to research the law applicable to the facts.

Appellant fails to demonstrate his counsel failed to research the law applicable to his case. Specifically, appellant fails to explain or establish that his defense counsel "misapprehended unreasonably that [G.H.] was a 'compromised witness' who need not be investigated and presented." Appellant does not explain his basis for this allegation, and we find no support in the record that defense counsel misunderstood the law on this subject.

Upon learning appellant wanted G.H. to testify, after she sat through trial testimony, defense counsel addressed the situation with the court reasonably considering the circumstances. The record shows defense counsel not conceding G.H. was a compromised witness, but explained, "*If* [G.H.] is here as a compromised witness ... I guess we have to live with that." (Italics added.) In reality, because G.H. was present in court during the testimony of her sister, C.H.,

25

and Officer Opinski, she was, in fact, a compromised witness. Appellant fails to demonstrate his counsel misunderstood the law on this subject.

Regardless, appellant cannot demonstrate prejudice. (See *In re Cox* (2003) 30 Cal.4th 974, 1019–1020 [no need to decide whether counsel's performance is deficient where there is no prejudice].) There is no evidence regarding what G.H. would have said if allowed to testify. As such, appellant cannot demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (See *Strickland, supra*, 466 U.S. at p. 694.)

### 3. Apology to M.H.

During direct examination, M.H. testified that appellant licked her ear and neck and put his fingers on her vagina. The prosecutor asked, "Was he saying anything to you at this time?" M.H. replied, "Can I take a break, please?" And a short break was taken. When M.H.'s testimony resumed, she explained that appellant asked her to be his girlfriend and told her that she was the "prettiest one." She reiterated, "he was licking me and he was doing that." During cross-examination, M.H. again testified that appellant licked her ear on the right side of her face and her neck. Thereafter, defense counsel remarked and asked M.H., "So he licks your ear[ ] and your neck, and I'm sorry that—I'm sorry that we're making you relive it—but he licks your ear[ ] and your neck, and then what happens after that?"

Later during closing argument, defense counsel stated that "the three complaining witnesses all demonstrated emotion to some degree, [M.H.] most of all maybe." Defense counsel then argued to the jury, "[M.H.] was like any other eight-year-old girl .... She found it difficult to be comfortable sleeping in a strange bed in someone else's residence, especially given the sleeping arrangements, which had four people sharing a bed .... [¶] ... [M.H.] tossed and turned all night, finally fell into a disturbed sleep out of sheer exhaustion, ... and she did not get up until the family living in the household had already gotten up and left her to sleep late, and that what she claims to have physically experienced was of no more substance than a disturbed dream, but that dream reverberated through the years and was communicated one way or another to [E.D.] and to other members of the [H.] family and then to [V.A.], members of that family, and finally to all of us, and it has now touched or [*sic*] lives, and it was is no more substance than a dream."

Appellant fails to demonstrate that his counsel's apology to M.H. on cross-examination for "making her 'relive it'" fell below an objective standard of reasonableness. As defense counsel acknowledged in closing arguments, M.H. was emotional. The record does not always convey the emotions of the witness while testifying, but here the record shows that M.H. requested a break, which supports the defense counsel's statements M.H. had been emotional.

While the record is silent as to the defense attorney's reason for apologizing, it cannot be said there is no basis for such decision. Counsel chose to address the emotional state of a witness, rather than ignore it. We accord substantial deference to an attorney's tactics during cross-examination. (See *People v. Cleveland, supra*, 32 Cal.4th at p. 746; *People v. Riel* (2000) 22 Cal.4th 1153, 1185.) Such decision to apologize may have been to defuse tension with the jury, to show that appellant is not callous, while still disagreeing with M.H.'s version of events. Appellant fails to show there is simply no satisfactory explanation for counsel's action. (See *People v. Anderson* (2001) 25 Cal.4th 543, 569.) On this record, appellant fails to demonstrate counsel's tactical decisions during cross-examination were

unreasonable or incompetent.

Contrary to appellant's claims, acknowledging the witness's emotions does not discredit the defense theory that these events were part of M.H.'s dream. Defense counsel addressed M.H.'s emotional reaction but explained to the jury that these events were only part of a bad dream, that as a child, she believed happened. Thus, defense counsel demonstrated skill in carefully diffusing potentially damaging emotions from M.H. while incorporating it to support the defense theory of the case.

We disagree that defense counsel's comment amounted to an opinion on appellant's guilt as in *People v. Torres* (1995) 33 Cal.App.4th 37. As appellant acknowledges, *Torres* addressed an officer's statement made as a witness during trial, which was evidence the jury could consider. Here, defense counsel's comments are not evidence, and the jury was so instructed.

Appellant's reliance on *United States v. Swanson* (9th Cir. 1991) 943 F.2d 1070 is also misplaced. In *Swanson*, the defense counsel told the jury during closing argument that the evidence against the defendant was overwhelming, that he was not going to insult the jurors' intelligence since he did not believe the case came "'to the level of raising reasonable doubt,'" and told the jury that "if they found Swanson guilty they should not 'ever look back' and agonize regarding whether they had done the right thing." (*Id*. at p. 1071.) The court held that the defense counsel's comments "caused a breakdown in our adversarial system of justice." (*Id*. at p. 1074.) The defense counsel lessened the Government's burden, tainted the integrity of the trial, and abandoned the defense of his client at a critical stage of the criminal proceedings. (*Ibid*.) Here, appellant concedes *Swanson* is distinguishable because here, defense counsel's comments were made to a witness during cross-examination and not in closing argument. We find *Swanson* further distinguishable because showing sympathy to an emotional witness is not remotely equivalent to abandoning his role as an adversary. An apology to an emotional witness is not the same as communicating to the jury a belief that appellant was guilty.

Nor does appellant demonstrate his counsel's apology to M.H. undermined confidence in the verdict on count 6. Defense counsel used the fact that M.H.'s testimony was not corroborated, and that when she woke up, C.H. and appellant were not in the room, to support the theory of the case that M.H. merely dreamed the events. Appellant fails to demonstrate that the defense theory was prejudiced by his apology to M.H.

Accordingly, appellant's claim that he received ineffective assistance of counsel fails.

Hernandez, 2024 WL 1223857, at *13-17.

> ### a.  Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v.

1   Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding

2   that where a defendant has been actually or constructively denied the assistance of counsel

3   altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

4   that Strickland does apply where counsel is present but ineffective).

5          To prevail, Petitioner must show two things.  First, he must establish that counsel's

6   deficient performance fell below an objective standard of reasonableness under prevailing

7   professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he

8   suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

9   errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

10  sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

11  counsel could have done; rather, it is whether the choices made by counsel were reasonable.

12  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

13         With the passage of the AEDPA, habeas relief may only be granted if the state-court

14  decision unreasonably applied this general Strickland standard for ineffective assistance.

15  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

16  federal court believes the state court's determination under the Strickland standard "was incorrect

17  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

18  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

19  is "doubly deferential" because it requires that it be shown not only that the state court

20  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

21  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

22  state court has even more latitude to reasonably determine that a defendant has not satisfied that

23  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

24  application was unreasonable requires considering the rule's specificity.  The more general the

25  rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

26              b.  Analysis

27         The state court reviewed Petitioner's claim under the appropriate Strickland standard and

28  determined that Petitioner failed to show counsel erred or that Petitioner suffered any prejudice as

1    a result. Thus, the only questions before this Court are whether those determinations were

2    objectively unreasonable.  The Court finds that they were not.

3        First, Petitioner fails to show that counsel erred by failing to investigate, in particular,

4    G.H., as a potential witness. The record instead shows that counsel was well aware of G.H. as a

5    potential witness, but his efforts to investigate her were unsuccessful. His investigator testified

6    that G.H. refused to speak with him. In addition, G.H. was a minor and her mother refused to let

7    investigators speak with her. It was only late in the case, at the close of the prosecution's case,

8    that Petitioner told counsel G.H. wanted to testify. But as the record shows, by this time, G.H.

9    was a compromised witness, having sat through her sister's and Officer Opinski's testimony

10   despite the judge's admonition to exclude witnesses.

11       Petitioner also fails to show prejudice. There is nothing in the record to show G.H. would

12   have provided beneficial testimony. Petitioner's claim that her testimony would have been helpful

13   is pure speculation. Moreover, the record shows that at best, her testimony would have been

14   cumulative of her sister's testimony. And regardless of the content of her testimony, the trial court

15   determined she was a compromised witness and therefore precluded from testifying. Thus, even if

16   counsel had erred, the result would not have been different: G.H. would still have been

17   unavailable.

18       As to Petitioner's claim that counsel failed to research the law applicable to the facts, he

19   again fails to show error or prejudice. Counsel advised the court of the reality of the situation.

20   G.H. sat through the trial during her sister's and Officer Opinski's testimony. Counsel then

21   acknowledged that "*If* [G.H.] is here as a compromised witness . . . I guess we have to live with

22   that." Defense counsel did not concede G.H. was a compromised witness but acknowledged the

23   possibility given the circumstances. A fairminded jurist could conclude that this was reasonable.

24   Petitioner also fails to demonstrate prejudice for the same reasons stated above. There is no

25   evidence that G.H.'s testimony would have been favorable to the defense; at best, she would have

26   provided cumulative evidence; and in any case, she was ruled a compromised witness.

27       Petitioner's claim regarding his apology to M.H. likewise fails. Counsel stated M.H. was

28   especially emotional. The record shows this is accurate. M.H. requested a break while testifying

1  about her recollection of the incident, and Counsel apologized that he was making her relive it,

2  but this went along with counsel's strategic decision. Counsel had argued that M.H. had only

3  dreamed the event as a child, but over time she believed the dream to be a reality. Defense

4  counsel argued her recollection had to be a dream because her testimony was not corroborated,

5  and when she woke up, C.H. and Petitioner were not in the room. Therefore, counsel's apology

6  was done to sympathize with M.H.'s emotions while at the same time maintaining her

7  recollection was only a dream that she now erroneously believed had actually occurred. Petitioner

8  fails to show that no fairminded jurist would agree with his reasoning and strategy.

9        In sum, Petitioner fails to overcome <u>Strickland's</u> high standard of demonstrating the state

10  court's rejection of his claim to be objectively unreasonable, nor does he show that the state court

11  decision resulted from an unreasonable determination of the facts.  The claim should be denied.

12  **IV.    RECOMMENDATION**

13        Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas

14  Corpus be DENIED with prejudice on the merits.

15        This Findings and Recommendation is submitted to the United States District Court Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

17  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

18  twenty-one (21) days after being served with a copy of this Findings and Recommendation, a

19  party may file written objections with the Court and serve a copy on all parties. <u>Id</u>. The document

20  should be captioned, "Objections to Magistrate Judge's Findings and Recommendation" and shall

21  not exceed fifteen (15) pages, except by leave of court with good cause shown. The Court will not

22  consider exhibits attached to the Objections. To the extent a party wishes to refer to any

23  exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page

24  number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in

25  excess of the fifteen (15) page limitation may be disregarded by the District Judge when

26  reviewing these Findings and Recommendations pursuant to 28 U.S.C. § 636 (b)(1)(C).  The

27  parties are advised that failure to file objections within the specified time may result in the waiver

28  of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014).  This

1    recommendation is not an order that is immediately appealable to the Ninth Circuit Court of

2    Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure,

3    should not be filed until entry of the District Court's judgment.

4

5    IT IS SO ORDERED.

6    Dated:   **August 12, 2025**                          /s/ *Sheila K. Oberto*

7                                                           UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28